IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NOAH AND REBEKAH ARD, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:04-cv-1189-MEF |
| | ) | |
| PROFESSIONAL RESOURCES | ) | |
| MANAGEMENT, a/k/a MAXIMUM | ) | |
| EFFICIENCY SQUARED, LLC, | ) | (WO-Not Recommended for Publication) |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION AND ORDER

In this lawsuit, Noah and Rebekah Ard allege that they were discriminated against in relation to certain employment decisions because Rebekah Ard has multiple sclerosis. Pursuant to 42 U.S.C. § 12101, *et seq.*, the Americans with Disabilities Act ("ADA") and 29 U.S.C. § 791, *et seq.*, the Rehabilitation Act of 1973, they seek redress. This cause is presently before the Court on Defendant's Motion for Summary Judgment Against Noah Ard (Doc. # 21) and Defendant's Motion for Summary Judgment Against Rebekah Ard (Doc. # 23), which Defendant Professional Resources Management ("PRM") filed on August 19, 2005. The court has carefully considered the undisputed evidence filed with the motion and the applicable law and discerned that the motion for summary judgment on Noah Ard's claims is due to be GRANTED, but that the motion for summary judgment on Rebekah Ard's claims is due to be DENIED for the reasons set forth below.

## I. JURISDICTION AND VENUE

Jurisdiction over this matter is properly asserted pursuant to 28 U.S.C. §1331.  The parties do not contest personal jurisdiction or venue and the Court finds adequate allegations of both.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.   An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed

to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, a party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Eberhardt v. Waters,* 901 F.2d 1578, 1580 (11th Cir. 1990).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### III.  FACTS

The court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the

light most favorable to the non-moving parties, establish the following material facts:

PRM is a healthcare management company.  It describes itself as an equal opportunity employer and has promulgated policies against discrimination, including discrimination on the basis of "handicap."  On May 16, 2002, PRM entered into a contract to operate a hospital facility in Luverne then called Crenshaw Baptist Hospital.  Pursuant to the contract, PRM was to begin operating the hospital under the name Crenshaw Community Hospital on July 1, 2002.

Under the terms of the contract by which it agreed to take over operating the hospital, PRM had no obligation to hire the employees of Outreach Services, Inc. who had worked in the hospital when it was operated by Outreach Services, Inc.  as Crenshaw Baptist Hospital. Thus, PRM made its own decisions regarding who to hire to work for it at Crenshaw Community Hospital.  Employees of Outreach Services, Inc. who wished to be considered for employment with PRM submitted employment applications to Crenshaw Baptist Hospital's human resources department prior to the July 1, 2002 takeover date.  Crenshaw Baptist Hospital's human resources department was to forward the applications to PRM along with a list of employees eligible for hire.[1]

Ultimately, PRM hired many of the employees who had worked for Outreach Services, Inc. while it operated the hospital.  PRM did not, however, hire Noah and Rebekah

---

[1] There is some evidence from which a reasonable jury might find that Rebekah Ard's name was originally on that list.

4

Ard who had worked for Outreach Services, Inc. at Crenshaw Baptist Hospital.[2]  This suit

arises out the PRM's decisions not to hire Noah and Rebekah Ard.

Rebekah Ard is a trained psychiatric mental health nurse.  In January of 1997, she

began working as a Psychiatric Nurse at Crenshaw Baptist Hospital, a hospital then being

operated by Outreach Services, Inc.  At this same time, Rebekah Ard's husband Noah Ard

also began working for Crenshaw Baptist Hospital.  He began in the maintenance and

housekeeping units of the hospital.  From sometime in 1999 until July of 2002, he served as

manager of the maintenance and housekeeping units.

Noah Ard submitted an application for employment with PRM dated June 14, 2002

seeking the position of Director of Maintenance and Housekeeping.[3]  PRM did not hire Noah

Ard for this position.  Instead, it selected Shane Dillon.  Although Noah Ard admits that he

---

[2]  According to the allegations of the Amended Complaint, Noah Ard and Rebekah Ard were employees of PRM and were fired in June of 2002.  Am.  Compl.  at ¶¶ 2, 3, & 7. These allegations are wholly unsupported by the evidence before this court.  It is clear from the evidence before the court that Noah Ard and Rebekah Ard were employees of Outreach Services, Inc., not PRM.  It is also clear that PRM decided not to hire Noah Ard.  As he was never hired by PRM, Noah Ard has no claim that he was fired by PRM.  As to Rebekah Ard, the evidence before this court establishes that PRM never received her application and did not hire her.  While it is not clear to this court that Noah and Rebekah Ard, who were represented by counsel at the time the complaint and amended complaints were filed, have adequately included allegations in their pleadings to present their actual claims for relief to this court, out of an abundance of caution, this court will address the claims that PRM's failure to *hire* Noah and Rebekah Ard was discriminatory as though those claims had actually been articulated in the amended complaint.

[3]  It is undisputed that the position of Director of Maintenance and Housekeeping for PRM was not identical to the position of manager of the maintenance and housekeeping units with Outreach Services, Inc.

5

does not know who made the decision for PRM regarding hiring Dillon instead of him and although he also admits that he does not know what factors were considered in filling the position, Noah Ard nevertheless contends that he was not hired because of his wife's disability.[4]  PRM proffers quite different reasons for its choice.

Despite being out on leave and having no information from her doctor concerning when she might be well enough to return to work,[5] Rebekah Ard completed an application for employment with PRM as a nurse in the psychiatric unit.  Her husband brought the application to her at home and then after she had completed it, he submitted this application for his wife by leaving it on the desk in the hospital human resources office in mid-June of 2002, prior to the PRM takeover of operations.  For reasons not clear from the evidentiary record before this court, PRM never received the application from Rebekah Ard.[6]  Rebekah

---

[4]  Rebekah Ard has multiple sclerosis.

[5]  Since being diagnosed with multiple sclerosis in 1990, Rebekah Ard has experienced a variety of physical problems relating to the disease.  As of the summer of 2002, Rebekah Ard's disease had limited her ability to walk long distances, to stoop or squat, to go up or down stairs without a handrail, and to run.  She had difficulties working 12-hour shifts.  Heat worsened her symptoms.  Due to job-related stress, Rebekah Ard sought medical help in May of 2002.  Her doctor recommended a temporary leave of absence from work. On May 17, 2002, Rebekah Ard went out on leave because she was unable to work.  On June 11, 2002, Rebekah Ard applied for leave under the Family Medical Leave Act from her employment at Crenshaw Baptist Hospital.    This application was supported by documentation from her physician.  The certification form from her doctor contains a place for the doctor to estimate the date the employee can return to work.  In this place, Rebekah Ard's doctor or his staff wrote "N/A."

[6]  Rebekah Ard admits that she has no way of knowing whether PRM actually received her application.

Ard admits that she does not know who made the decision about who to hire for the position for which she applied and that she does not know what criteria were used to fill the positions. PRM did not hire Rebekah Ard. While Rebekah Ard admits that no one told her that her multiple sclerosis was the reason that she was not selected for the position with PRM for which she had applied, she contends that PRM discriminated against her on the basis of her disability. PRM denies this claim.

PRM charged Allen Gamble ("Gamble") and Vicki Lawrenson ("Lawrenson") with making hiring decisions for the inpatient hospital facility which PRM would operate under the name Crenshaw Community Hospital after taking it over from Outreach Services, Inc. Gamble was the incoming Administrator of Crenshaw Community Hospital. Lawrenson was the Vice President of Operations for PRM. Gamble and Lawrenson have provided sworn testimony stating that they did not consider whether any potential candidate had any association with an individual with a disability or whether any potential candidate had a disability when they were making the hiring decisions for Crenshaw Community Hospital in the summer of 2002. Moreover, it is undisputed that Gamble and Lawrenson hired at least one employee to work at Crenshaw Community Hospital despite knowing that her husband had serious disabilities.

Gamble and Lawrenson were the only individuals involved in making hiring decisions for PRM at the Crenshaw. Although Jacques Jarry ("Jarry") was present for some of the interviews, Gamble and Lawrenson did not receive input from him. In making the hiring

decisions, Gamble and Lawrenson considered the applications submitted by the applicants. With respect to the Director of Maintenance and Housekeeping position, Gamble and Lawrenson also considered the complaints that they had received from former Crenshaw Baptist Hospital employees about Noah Ard's performance and their own observations of the condition of the hospital facility which Noah Ard had been responsible for maintaining.

With respect to the condition of the hospital, Gamble and Lawrenson noted that the condition of the paint and floors did not meet their expectations. Lawrenson was appalled that Noah Ard had converted a revenue-producing patient room in a small hospital into an office for himself.[7] Gamble was dissatisfied with the lack of documentation for maintenance available. For example, he could not locate a maintenance log or other documentation of periodic inspections or preventative maintenance. Gamble also found a wall switch with an "out of order-do not use" sticker on it with Noah Ard's initials and a date that was more than a year before Gamble's inspection. Both Gamble and Lawrenson received numerous complaints from employees of Crenshaw Baptist Hospital concerning Noah Ard's job performance. The employees complained that Noah Ard was not responsive, that needed repairs and maintenance were not performed during his tenure, that Noah Ard contracted out maintenance functions that should have been performed in-house, that employees were afraid to complain about Noah Ard because of his close relationship with his immediate supervisor,

---

[7]  It is undisputed that the conversion of this room to an office involved several structural changes. When PRM converted the room back to a patient room, the cost of the changes were several thousand dollars.

the Assistant Administrator for the hospital, and that Noah Ard spent a great deal of time with his supervisor offsite or at least not working.[8]

Gamble and Lawrenson were specifically interested in hiring a person for the Director of Maintenance and Housekeeping position who would be able to perform hands on maintenance duties. They preferred an applicant with construction experience and air-conditioning certifications. They also envisioned that the person hired for this position would have responsibility for a significant amount of purchasing. Based on the content of the job applications submitted by Dillon[9] and Noah Ard,[10] both Gamble and Lawrenson concluded that Dillon was most qualified for the position of Director of Maintenance and Housekeeping.

Gamble and Lawrenson offered the position of Director of Maintenance and Housekeeping to Dillon. Dillon accepted the position. According to management and certain employees of Crenshaw Community Hospital, Dillon has done very well in the

---

[8] The fact that these complaints were indeed made about Noah Ard is confirmed by the affidavits of Ray Cowart, Terri Davis, Denise Green, and Ken Lyons.

[9] According to Dillon's application, he had a refrigeration license, nearly three years experience as a field purchasing agent for a construction company, approximately one year of experience as a refrigeration and air-conditioning repair specialist, and significant maintenance experience for a hospital and a chain of restaurants.

[10] According to Ard's application he had worked in maintenance for two hospitals for undisclosed periods of time, worked as the owner operator of a beauty salon and worked a sales route for a bread company. Noah Ard's application failed to list any professional licenses, training, or certifications. Noah Ard's application did not mention any work with appliances or purchasing, nor did it list any construction experience. Noah Ard's application makes no mention of any skills he obtained during his military service.

position.  Noah Ard filed this lawsuit complaining that he was more qualified than Dillon and

should have received the job.  Noah Ard contends that his wife's disability is the reason that

he was not selected.  Noah Ard apparently formed this belief based on his opinion that his

qualifications are superior to Dillon's qualifications and based on some conversations he had

with Jarry before the hiring decision at issue was made.

Before he had ever formally interviewed or applied for a job with PRM, Noah Ard

went to the Bullock County Hospital which PRM operated.  Jarry gave him a tour and

introduced him to several people.  At some point, Jarry told Noah Ard not to worry because

he would have a job and that he really liked what Ard had done with the Crenshaw facility.

According to Noah Ard, Jarry also said something that caused him to believe he would have

supervisory responsibilities for both the Bullock County facility and the Crenshaw County

facility after PRM took over the Crenshaw County facility.

Additionally, Noah Ard testified that he encountered Jarry in the hall on the date of

his last job interview in June.[11]  According to Noah Ard, Jarry put his hand on Ard's shoulder

and asked how he was doing.  Noah Ard replied that he was fine and asked how Jarry was.

After responding to this query, Jarry reportedly asked how Noah Ard's wife was doing and

Noah Ard replied that she was fine.  According to Noah Ard's testimony, Jarry then said that

he was sorry to hear that she was on disability due to her "MS" and that "we won't be able

---

[11]  Initially, Noah Ard testified that this was on June 24, 2002, but later he testified
that he had been mistaken and it was actually on June 20, 2002.

to use her." Noah Ard viewed Jarry as appearing sympathetic during this conversation.

After this brief conversation with Jarry in the hallway, Noah Ard went to his final job interview with Jarry, Gamble and Lawrenson. Jarry asked Noah Ard questions about the facility, the equipment, and different supply companies used. Jarry also said something to the effect that if Rebekah Ard was not able to get disability he might be able to use her on an as needed or part-time basis. Jarry also recommended that Noah Ard check with Baptist's insurance. A few days after this interview, Noah Ard learned that PRM was not going to hire him.

Noah Ard contends that Jarry's statements in the hall are how he and Rebekah Ard learned that PRM had decided not to hire her. It is undisputed that PRM never sent Rebekah Ard formal notice that she was not going to be hired. PRM has no record of Rebekah Ard having made an application for employment.

Rebekah Ard does not dispute that she has not worked since May 17, 2002. She does not dispute that since the summer of 2002, her condition has worsened as her disease has progressed. At some point, she applied for long-term disability insurance benefits. On June 17, 2002, her doctor certified that her present job could not be modified to handle her impairment and that she was not a suitable candidate for vocational rehabilitative services. Rebekah Ard was successful at obtaining long-term disability insurance benefits which began in August of 2002 based on a finding that she qualified for the benefits as of May 18, 2002.

Despite this Rebekah Ard contends that she believes she would be able to perform a

11

nursing job at the hospital now with the proper accommodations such as the hours that she would work.  She cannot now, and could not in July of 2002, work a twelve hour shift, but would require eight-hour shifts with rest periods every thirty minutes to an hour during her shift.  She admits that she has never asked anyone at PRM for any of these accommodations.

## IV.  DISCUSSION

### A.  Noah Ard's Claim

In this suit, Noah Ard claims that Defendant discriminated against him because of his wife's disability.  As previously noted, he brings suit pursuant to the ADA[12] and the Rehabilitation Act.

> The standard for determining liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.* ("ADA"); thus, cases involving the ADA are precedent for those involving the Rehabilitation

---

[12]  As the Eleventh Circuit Court of Appeals has explained,

> [t]he ADA mandates that covered employers shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Under the Act, the term "discriminate" is defined to include, among other factors, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).

*Wascura v. City of South Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001).

>     Act. *Cash v. Smith,* 231 F.3d 1301, 1305 (11th Cir.2000); *see*
>     *also* 29 U.S.C. § 794(d).

*Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  Although Noah Ard argues that

there is direct evidence to support his claim, the court disagrees that there is anything

constituting direct evidence of discrimination, as that type of evidence has been defined by

the Eleventh Circuit Court of Appeals,[13] in this case.  Accordingly, this court will analyze this

case as one in which the plaintiff relies on circumstantial, rather than direct, evidence.  *See,*

*e.g., Wascura,* 257 F.3d at 1242 (applying Title VII burden shifting analysis[14] to case brought

pursuant to the ADA based on circumstantial rather than direct evidence).  To establish a

*prima facie* case of association disability discrimination under either statute, a plaintiff must

establish

>           (1) that [he] was subjected to an adverse employment action; (2)
>           [he] was qualified for the job at that time; (3) that [his] employer
>           knew at that time that [he] had a relative with a disability; and
>           (4) that "the adverse employment action occurred under
>           circumstances which raised a reasonable inference that the
>           disability of the relative was a determining factor in [the
>           employer's] decision."

---

[13]  A summary of Eleventh Circuit Court of Appeals cases explaining the nature of
direct evidence in employment discrimination cases is found in *Wascura,* 257 F.3d at 1242
n.2.

[14]  The United States Supreme Court has set forth a burden-shifting scheme for
discriminatory-treatment cases.  Under this scheme, a plaintiff must first establish a *prima*
*facie* case of discrimination.  The burden then shirts to the employer to articulate a legitimate,
nondiscriminatory reason for the challenged employment action.  If the employer meets this
burden, the presumption of intentional discrimination disappears, but the plaintiff can still
prove disparate treatment, by offering evidence demonstrating that the employer's
explanation is pretextual.  *See, e.g., Raytheon Co. v. Hernandez,* 540 U.S. 44, 49 n.3 (2003).

13

*Wascura,* 257 F.3d at 1242 (*quoting Hilburn v. Murata Elec. N. Am., Inc.,* 181 F.3d 1220, 1226 (11th Cir. 1999)).

PRM contends that no reasonable jury could find that Noah Ard has established a *prima facie* case because there is no evidence that he was qualified for the job or that the circumstances of the adverse employment action raise a reasonable inference that the disability of his wife was a determining factor in PRM's decision. The court finds that there is sufficient evidence from which a reasonable jury might find that Noah Ard was minimally qualified for the position. With respect to the final element of the *prima facie* case, however, the court finds no evidence from which a reasonable jury could find that Rebekah Ard's disability was a determining factor in PRM's decision not to hire Noah Ard. Because he can not establish a *prima facie* case, PRM is entitled to summary judgment on Noah Ard's claims.

In the alternative, even if this court were to assume *arguendo* that Noah Ard has offered sufficient evidence to establish a *prima facie* case, the court still finds that PRM is entitled to summary judgment. Once a plaintiff establishes a *prima facie* case of discrimination, the employer must articulate a legitimate, non-discriminatory reason for the challenged action. *See Wascura,* 257 F.3 at 1242. If the employer articulates one or more such reasons, the presumption of discrimination created by the *prima facie* case is eliminated and the plaintiff has the opportunity to come forward with evidence, including the evidence offered in support of the *prima facie* case, sufficient to permit a reasonable fact-finder to

14

conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  *See, e.g., Wascura,* 257 F.3d at 1243.

The court has carefully considered all of the evidence before it in the light most favorable to Noah Ard.  In light of the ample legitimate reasons for the decision to hire Dillon instead of Noah Ard proffered by PRM, the truth of which was never effectively challenged, the court cannot conclude that a reasonable jury could find for Noah Ard or that he has adduced evidence to generate a genuine issue of fact as to the reasons proffered by PRM for its decision not to hire him.  Accordingly, the court grants summary judgment to PRM on Noah Ard's claims.

**B.  Rebekah Ard's Claims**

Like her husband, Rebekah Ard contends that she has adduced direct evidence of disability discrimination in support of her claim.  As with the evidence adduced by her husband, the court is not persuaded that the evidence constitutes direct evidence of discrimination.  Accordingly, her claim will be analyzed as a claim predicated on circumstantial evidence.  "To establish a *prima facie* case of discrimination under the [Rehabilitation Act or the ADA], an individual must show that (1) [s]he has a disability; (2) [s]he is otherwise qualified for the position; and (3) [s]he was subjected to unlawful discrimination as the result of [her] disability."  *Sutton v. Lader,* 185 F.3d 1203, 1207 (11th Cir. 1999).  The court notes that some courts have criticized the Eleventh Circuit Court of Appeals' articulation of the third element of the *prima facie* case.  *See, e.g., Boyd v.*

*Province Healthcare Co.,* 2005 WL 3132394, *4 n.16 (S.D. Ala.  Nov.  22, 2005); *Brandon*

*v.  Lockheed Martin Aeronautical Sys.,* 393 F.  Supp.  2d 1341, 1345-46 (N.D. Ga.  2005).

The court agrees that the third element of the *prima facie* case is more properly understood

as obliging a plaintiff to show that she was subjected to adverse employment action under

circumstances suggesting a causal link to her disability.

In addition to the elements of the *prima facie* case set forth above, PRM also contends

that Rebekah Ard must be able to show that she applied for the position to establish a *prima*

*facie* case.  While there is some support from other circuits for this position, it is not entirely

clear that the Eleventh Circuit Court of Appeals has recognized this element as a part of the

*prima facie* case in the context of disability discrimination.  It is, of course, beyond dispute

that the Eleventh Circuit Court of Appeals has recognized the element as a part of the *prima*

*facie* case in the context of other types of employment discrimination.  It is not a question

that this court need to settle, however, because the court is satisfied that Rebekah Ard has

presented sufficient evidence from which a reasonable jury could find that she applied for

a nursing position despite the fact that PRM contends that it did not receive the application.

There is ample evidence that Rebekah Ard completed an application for employment and that

her husband submitted that application in the way that the applications were intended to be

submitted to the agent designated by PRM for receipt of such applications.

PRM argues that Rebekah Ard cannot establish a *prima facie* case of disability

discrimination for a variety of reasons.  It further argues that she has failed to demonstrate

that its legitimate nondiscriminatory reasons for not hiring her were a pretext for disability discrimination.  When the facts are viewed in the light most favorable to Rebekah Ard, the court cannot say that no genuine issues of material fact exist and that PRM is entitled to judgment as a matter of law.  A reasonable jury could find that Rebekah Ard has presented sufficient evidence to support a *prima facie* case of disability discrimination arising out of PRM's failure to hire her.  While PRM has offered a legitimate, nondiscriminatory reason for failing to hire her, namely that it did not receive her application, a reasonable jury might, in the circumstances of this case find that reason to be pretextual.[15]

## V.  CONCLUSION

For the reasons stated above, the Court finds that PRM is entitled to summary judgment on all of Noah Ard's claims; however, PRM is not entitled to summary judgment on Rebekah Ard's claims.  Accordingly, it is hereby ORDERED as follows:

(1) Defendant's Motion for Summary Judgment Against Noah Ard (Doc. # 21) is GRANTED and all claims by Noah Ard against Professional Resources Management are DISMISSED WITH PREJUDICE.

(2)  Defendant's Motion for Summary Judgment Against Rebekah Ard (Doc. # 23)

---

[15] PRM also argues that another legitimate, nondiscriminatory reason for the decision not to hire Rebekah Ard was her inability to perform what it believes are essential functions of the job.  Of course, PRM cannot really have it both ways.  The reason that the decisionmakers gave for not hiring Rebekah Ard was that they did not receive her application.  Any conjecture about whether they would have wanted to hire her or deemed her qualified if they had received the application is purely speculation.  It is not, in the circumstances of this case, a reason for the challenged employment decision.

17

is DENIED.

DONE this the 29th day of March, 2006.

_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE